**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| FLOYD REYNOLDS, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>IMAX CORPORATION, RICHARD L. GELFOND, BRADLEY J. WECHSLER and FRANCIS T. JOYCE,<br><br>Defendants. | Civil Action No. 06 CV 6693<br><br>ECF CASE<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

RECEIVED
SEP 05 2006
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff, on behalf of himself and all others similarly situated, alleges the following upon personal knowledge as to himself and his own acts, and upon the investigation of his counsel, which included, among other things, a review and analysis of Defendants' public documents, filings with the United States Securities and Exchange Commission ("SEC"), and press and media reports regarding IMAX Corporation ("IMAX" or the "Company"). Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1. This is a federal class action on behalf of all persons and entities who purchased or otherwise acquired IMAX securities between February 17, 2006 and August 9, 2006 (the "Class Period"), inclusive. Plaintiff seeks to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2. Federal subject matter jurisdiction exists pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 78aa, as Plaintiff asserts claims under Sections 10(b) and 20(a) of the Exchange Act and Rules 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

3. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b), because Defendants conduct substantial business within this District. IMAX maintains its United States headquarters in this District. Many of the alleged acts, transactions, and conduct complained of, including the formulation of Company policy and the dissemination of consolidated IMAX financial statements to IMAX shareholders during the Company's Annual Meeting of Shareholders occurred in this District.

4. In connection with the acts alleged in this Complaint, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the mails, telephone communications, and the facilities of the national securities exchanges.

## THE PARTIES

5. Plaintiff Floyd Reynolds ("Plaintiff"), as set forth in his certification, which is attached hereto and incorporated by reference herein, purchased IMAX securities during the Class Period and has been harmed by the false and misleading statements and material omissions as alleged herein.

6. Defendant IMAX is a corporation registered under the laws of the Country of Canada. IMAX is headquartered jointly at 110 East 59th Street, Suite 2100, New York, New York, and at 2525 Speakman Drive, Mississauga, Ontario, Canada. Founded in 1967, IMAX is one of the world's leading entertainment technology companies. Through

its chain of "high-tech" cinemas, IMAX distributes films made in the United States. IMAX has 274 movie theaters operating in 38 countries.

7. Defendant Richard L. Gelfond ("Gelfond") has been Co-Chairman of IMAX since June 1999 and Co-Chief Executive Officer since May 1996. From March 1994 to June 1999, Gelfond served as Vice Chairman of the Company. Gelfond is a resident of New York, New York.

8. Defendant Bradley J. Wechsler ("Wechsler") has been Co-Chief Executive Officer of IMAX with Mr. Gelfond since May 1996. From March 1994 to June 1999, Wechsler served as Chairman of the Company and has served as IMAX's Co-Chairman with Mr. Gelfond since June 1999. Wechsler is a resident of New York, New York.

9. Defendant Francis T. Joyce ("Joyce") was the Company's Chief Financial Officer from 2001 through August 21, 2006.

10. Defendants Gelfond, Wechsler and Joyce are at times in this Complaint referred to as the "Individual Defendants."

11. As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the Nasdaq Stock Exchange (the "Nasdaq"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's performance, operations, business, products, markets, management and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would be based upon truthful and accurate information. The Individual

Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

12. The Individual Defendants, because of their positions of control and authority as officers of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein, and each of the Individual Defendants is therefore primarily liable for the misrepresentations contained therein. The Individual Defendants are also liable as controlling persons of the Company.

13. It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, corporate press releases and other public statements as alleged herein were the collective actions of the narrowly defined group of Defendants identified above. Each of the above officers of IMAX, by virtue of his high-level position with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations and products, as alleged herein. The Individual Defendants were also directly involved in making, drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the

Company, and approved or ratified these statements, in violation of the federal securities laws.

14. Each of the Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of IMAX securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding IMAX's business, operations, products and the intrinsic value of IMAX securities; (ii) deceived the investing public regarding the true condition of IMAX's revenues and financial performance; and (iii) caused Plaintiff and other Class members to purchase IMAX securities at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

### Background

15. IMAX cinema systems are popular with audiences. The quality and size of the "high-tech" screens produce a unique cinematic experience. At the end of 2005, however, IMAX was undergoing financial upheaval. The Company announced disappointing quarterly financial results in November 2005, negatively impacting the value of the Company's share price. Analysts attributed the poor financial results to the Company's inability to timely install its "high-tech" cinema systems. Although the cinema systems were successful after installation, IMAX installed only seven new systems during the quarter ended September 30, 2005, four less than anticipated.

### False and Misleading Statements during the Class Period

16. On February 17, 2006, IMAX announced its anticipated financial results for the quarter and year ended December 31, 2005. According to the Company's press release issued on February 17, 2006, IMAX expected to meet or exceed the full year

2005 guidance it provided investors of $0.35 to $0.38 in net earnings per share on a fully diluted basis and expected to report revenues in line with its prior guidance of $145 to $150 million for all of 2005. The Company claimed the financial results reflected the "strong tone and momentum of its business."

17. The February 17, 2006 press release quoted Defendants Gelfond and Wechsler touting IMAX's financial results as follows:

> "IMAX's momentum and growth potential is building," said IMAX Co-Chairmen and Co-CEO's Richard L. Gelfond and Bradley J. Wechsler. "IMAX set aggressive goals for theatre signings, film performance, installations and financials results for 2005, and we are extremely pleased to report that we believe we have delivered on all fronts. Successfully completing 14 theatre system installations in the most recent quarter underscores the rapidly expanding nature of the IMAX network, an expansion that should continue to grow our recurring revenues."

18. The February 17, 2006 release also said:

> IMAX also announced that in addition to completing 14 theatre installations, the Company signed deals for eight theatre systems during the fourth quarter, one of which remains subject to a condition. The Company signed deals for 45 theatre systems for the full year 2005, at the high end of its 40-45 signings guidance. By comparison, the Company signed deals for 36 theatre systems in 2004, and 25 in 2003.

19. The February 17, 2006 press release contained false and misleading statements of material fact. Unknown to IMAX's shareholders, IMAX had improperly recognized revenue in the fourth quarter of 2005 on ten theater installations in theaters that did not open during that quarter.

20. After the Company issued the February 17, 2006 press release, the price of IMAX common shares increased to $8.60, up from $7.82. IMAX's share price continued to rise over the following months.

21. On March 9, 2006, IMAX announced that its Board of Directors had begun a process to "explore strategic alternatives to enhance shareholder value," including the sale or merger of the Company with another entity offering strategic opportunities for growth. IMAX also announced that it had retained Allen & Company and UBS Investment Bank as financial advisors.

22. The March 9, 2006 press release quoted the Individual Defendants touting the financial strength of the Company as follows:

> "In order to fully realize the growth potential inherent in both the IMAX brand and the business we have built to date, we are evaluating strategic alternatives in order to expand our scale and maximize value for our shareholders. We have recently received several unsolicited inquiries, and believe this preliminary interest shows that there is awareness of the strength and attractive qualities of our business. We think this interest, coupled with our solid fiscal 2005 results and compelling grown opportunities, makes this an ideal time to explore our options," said IMAX Co-Chairmen and Co-Chief Executive Officers Richard L. Gelfond and Bradley J. Wechsler.

23. On March 9, 2006, IMAX released its financial results for the quarter and fiscal year ended December 31, 2005. The financial results released on March 9, 2006 substantially echoed the financial results the Company issued on February 17, 2006. In the March 9, 2006 press release, IMAX reported net earnings of $0.40 per share, exceeding the guidance of $0.35-$0.38 per share. IMAX also reported net earnings of $0.29 per diluted share for the three months ended December 31, 2005, compared to net earnings of $0.19 per diluted share reported for three months ended December 31, 2004,

an increase of 54%.

24. The March 9, 2006 press release also said:

> For the year ended December 31, 2005, total revenues of $144.9 million, as compared to $136.0 million reported for the prior year. Systems revenue was $97.8 million versus $86.6 million in the prior year. The Company recognized revenue of 38 theatre systems which qualified as either sales or sales-type leases in the fiscal 2005, versus 22 in 2004.
>
> * * *
>
> For the three months ended December 31, 3005, total revenues were $49.3 million, as compared to $47.5 million reported for the prior year period. Systems revenue of 35.1 million versus $28.8 million in the prior year period. The Company recognized revenue on 18 theatre systems which qualified as either sales or sales-type leases in the fourth quarter of 2005, compared to nine in 2004.

25. The March 9, 2006 press release quoted Defendants Gelfond and Weschler touting the financial success of the Company as follows:

> "Our 2005 results clearly reflect that IMAX's commercial strategy is working and that the momentum in our business is continuing to grow," said IMAX Co-Chief Executive Officers Richard L. Gelfond and Bradley J. Wechsler. "We set aggressive goals for the year, and we believe our performance in 2005 demonstrates the increasing acceptance of IMAX as a commercial destination for mainstream entertainment."

26. The March 9, 2006 press release contained false and misleading statements of material fact. Unknown to IMAX's shareholders, IMAX had improperly recognized revenue in the fourth quarter of 2005 on ten theater installations in theaters that did not open in that quarter.

27. On March 9, 2006, IMAX filed with the SEC its report on Form 10-K for the fiscal year ended December 31, 2005. The Individual Defendants signed the Form

10-K and certified, pursuant to 18 U.S.C. § 1350 (Section 906 of the Sarbanes-Oxley Act of 2002), that the Form 10-K fairly represented, in all material respects, the financial condition and results of operations of the Company.

28. The Form 10-K specifically said that IMAX had installed ten theater systems in 2005 which were scheduled to open in the first quarter and second quarter of 2006, and that these systems were not included in either the opened theater network base or the Company's sales backlog figure. The Company describes its sales backlog as follows:

> The Company lists signed contracts for theater system sales and sales-type leases as sales backlog prior to the time of revenue recognition. Sales backlog represents the total value of all signed system sales and lease agreements that are expected to be recognized as revenue in the future and includes initial rental fees along with the present value of contractual minimum rents due over the lease term, but excludes maintenance revenues as well as rents in excess of contractual minimums that might be received in the future.

29. The statements made on March 9, 2006 in the Company's press release and in its Form 10-K were materially false and misleading, because IMAX knew that, in the quarter ended December 31, 2005, it had improperly recognized revenue on 10 theatre installations in theatres which did not open during that quarter. In seven of these cases, revenue associated with the screen element of the system was deferred until the final screen was installed.

30. After the Company released its results on March 9, 2006, the price of IMAX common shares increased to $10.95, up from $9.52.

31. On May 9, 2006, IMAX issued a press release announcing the Company's financial results for the quarter ended March 31, 2006. In the May 9, 2006 press release, IMAX reported a net loss of $0.14 per diluted share for the quarter ended March 31,

2006, compared to net earnings of $0.03 per diluted share reported for the three months ended March 31, 2005. IMAX also announced total revenues of $20.4 million for the three months ended March 31, 2006, as compared to $31.4 million reported for the prior year period, and reported systems revenue of $9.4 million versus $22.1 million in the prior year period. The Company said that it expected to record revenues of approximately $40 million and earnings per share of $0.05-$0.08 during the second quarter of 2006.

32. The May 9, 2006 press release quoted Defendants Gelfond and Wechsler touting the financial success of the Company as follows:

> [IMAX] continued to make progress executing our core growth initiatives and implementing our commercial strategy during the first quarter. We remain optimistic that we will continue to improve upon our 2005 performance, where all of the Company's key metrics were up solidly.

33. On May 9, 2006 IMAX filed its Form 10-Q with the SEC for the quarter ended March 31, 2006. As required pursuant to 18 U.S.C. § 1350 (Section 906 of the Sarbanes-Oxley Act of 2002), the Company submitted to the SEC the certifications the Individual Defendants, stating that the Form 10-Q fairly represented, in all material respects, the financial condition and results of operations of the Company.

34. The May 9, 2006 press release and Form 10-Q contained false and misleading statements of material fact. Unknown to IMAX's shareholders, IMAX had implemented improper revenue recognition procedures during the quarter ended March 31, 2006, that allowed the Company to segregate financial revenues from different elements of an IMAX theater system, and recognize those revenues in different quarters.

35. After the Company released its results on May 9, 2006, the price of IMAX common shares increased to $9.67, up from $9.45.

**The Truth is Partially Revealed**

36. On August 9, 2006, IMAX shocked the market by announcing the Company was under investigation by the SEC and that it had uncovered a "material weakness" in the Company's accounting for a movie transaction.

37. The August 9, 2006 press release described IMAX's financial results for the quarter ended June 30, 2006. The Company stated that for the three months ended June 30, 2006, IMAX had recorded total revenues of $41.4 million, as compared to $30.9 million reported for the prior year period, and systems revenue of $24.0 million versus $20.3 million in the prior year period.

38. These financial results were false and misleading because unknown to IMAX's shareholders, IMAX had implemented improper revenue recognition procedures during the quarter ended June 30, 2006, that allowed the Company to segregate revenues from different elements of an IMAX theater system, and recognize those revenues in different quarters.

39. The August 9, 2006 press release also informed investors that IMAX was under investigation from the SEC because of the Company's practice of segregating revenue and recognizing that revenue in different financial quarters, as follows:

> The Company indicated that it is in the process of responding to an informal inquiry from the U.S. Securities and Exchange Commission regarding the Company's timing of revenue recognition, including its application of multiple element arrangement accounting in its revenue recognition for theatre systems. Under multiple element arrangement accounting, the revenues associated with different elements of an IMAX theatre system contract are segregated and can be recognized in different periods. The Company recognized revenue in the fourth quarter of 2005 on 10 theatre installations in theatres which did not open in that quarter, and in seven of those cases, revenues associated with the screen element of the system was

> deferred until the final screen was installed. Of these seven installations, three theatres had their screens completed in the first quarter of 2006, two in the second quarter of 2006, and screens in the remaining two theatres have either since been completed or are expected to be completed over the remainder of 2006. The value associated with the elements other than the screen elements of those system installations was recognized in the fourth quarter when they were substantially completed.

40. IMAX also reported on August 9, 2006 that it had uncovered a material weakness in its accounting for a "complex film accounting transaction" impacting revenues of $0.8 million, as follows:

> The Company indicated that as part of its quarterly certification under Section 302 of the Sarbanes-Oxley Act, it has identified a material weakness in the internal controls surrounding the analysis and recording of a complex film accounting transaction in the second quarter of 2006. This control deficiency resulted in a negative adjustment of $0.8 million to its Consolidated Statement of Operations for the three months ended June 30, 2006 prior to its release in the financial statements filed today. This $0.8 million in film revenue is likely to instead be recognized in substantial part in the third quarter of 2006.

41. On August 9, 2006, IMAX also announced that it had not found an investor willing to purchase or merge with the Company for a price IMAX deemed acceptable.

42. After issuing its press release on August 9, 2006, the price of IMAX shares plummeted, falling by 40.6 percent or $3.91 on the following trading day. The decline in IMAX's stock price is a direct result of the nature and extent of Defendants' false statements being revealed to investors and the market. The crash of the Company's stock price caused significant harm to Plaintiff and IMAX's other public shareholders.

43. On August 21, 2006, IMAX announced that Defendant Joyce had resigned as the Company's Chief Financial Officer. Following that announcement, the share price of IMAX common stock continued its decline.

**ADDITIONAL SCIENTER ALLEGATIONS**

44. As alleged throughout this Complaint, Defendants acted with scienter in that Defendants knew that the public statements issued or disseminated in the name of Defendants were materially false and misleading; knew that such statements would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements as primary violations of the federal securities laws. Additionally, Defendants culpably participated in the fraudulent scheme alleged herein through their knowledge of the true facts regarding IMAX; their control over, receipt of and/or modification of IMAX's materially misleading omissions and misstatements; and/or their associations with IMAX which made them privy to confidential proprietary information concerning IMAX.

45. Defendants participated in the wrongful conduct alleged in this Complaint, had actual knowledge of such fraudulent conduct, and/or were highly motivated to allow and facilitate such wrongful conduct.

46. During the Class Period, IMAX and the Individual Defendants actively sought to sell the Company or merge the Company with another entity so as to raise capital. IMAX retained Allen & Company and UBS Investment Bank as financial advisors in this process. To effectuate a sale or merger of IMAX, and to gain as higher price as possible for IMAX in such a transaction, it was critical for the Defendants that the value of IMAX was perceived to be high. Therefore, IMAX and the Individual Defendants sought to bolster the share price of the Company by strategically recognizing

revenue when it most suited the Company, even when such revenue recognition policies violated recognized accounting principles.

## NO STATUTORY SAFE HARBOR

47. The federal statutory "safe harbor" provided for forward-looking statements under certain circumstances does not apply to the forward-looking statements, if any, pleaded in this Complaint. The statements alleged to be false or misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward-looking, there were no meaningful cautionary statements identifying the important factors that caused the actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statement pleaded, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made and so identified, the speaker knew or recklessly disregarded that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized and/or approved by Defendants who knew or recklessly disregarded that those statements were false when made.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

48. Throughout the Class Period, the market for IMAX common stock was efficient for, among other things, the following reasons:

a. IMAX common stock met the requirements for listing, was listed, and was actively bought and sold on the Nasdaq, a highly efficient and automated market;

b. Periodic public reports regarding IMAX, a regulated company, were regularly filed with the SEC;

c. Defendants and other persons associated with IMAX regularly communicated with public investors through established market communication mechanisms, including regularly disseminating press releases on major national newswire services, communicating with the financial press, and making public disclosures through other similar reporting services; and

d. Several securities analysts with major brokerage firms followed and wrote reports regarding IMAX. These reports were provided to their respective firms' sales force, distributed to customers, made publicly available and transmitted throughout the marketplace.

49. As a result, the market for IMAX common stock promptly digested current information regarding IMAX from all publicly available sources and reflected such information in IMAX's share price. Investors who purchased or otherwise acquired shares of IMAX common stock relied on the integrity of the market for such securities. Under these circumstances, all purchasers of IMAX common stock during the Class Period suffered similar injury through their purchase or acquisition of IMAX common stock, and a presumption of reliance applies.

## CLASS ACTION ALLEGATIONS

50. Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of himself and a class of persons (the "Class") initially defined as follows:

> All persons or entities who purchased or otherwise acquired IMAX Corporation securities between February 17, 2006 and August 9, 2006 inclusive, and who were damaged thereby.
>
> Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, any entity in which Defendants have or had a controlling interest, the judge to whom this case is assigned and his or her immediate family.

51. **Numerosity of the Class** – Fed. R. Civ. P. 23(a)(1): Members of the Class are so numerous that their individual joinder herein is impracticable. Throughout the Class Period, IMAX's common stock was actively traded on the Nasdaq. Although the precise number of Class members and their addresses are unknown to Plaintiff at this time, Plaintiff believes there to be, at a minimum, thousands of members in the proposed Class. As of February 21, 2006, IMAX had more than 40 million common shares outstanding. Class members are readily ascertainable from Defendants' records and may be notified of the pendency of this action by mail, supplemented (if deemed necessary or appropriate by the Court) by published notice.

52. **Existence and Predominance of Common Questions of Law and Fact** – Fed. R. Civ. P. 23(a)(2), (b)(3): Common questions of law and fact exist as to all members of the Class. These questions predominate over the questions affecting only individual Class members. These common legal and factual questions include:

a. Whether the federal securities laws were violated by Defendants' acts alleged herein;

b. Whether statements made by Defendants to the investing public during the Class Period misrepresented material facts; and

c. To what extent Class members sustained damages and the proper measure of damages.

53. **Typicality** – Fed. R. Civ. P. 23(a)(3): Plaintiff's claims are typical of the claims of Class members because Defendants wrongful and unlawful conduct, as alleged herein, similarly affected all members of the Class.

54. **Adequacy** – Fed. R. Civ. P. 23(a)(4): Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the members of the Class he seeks to represent. Plaintiff has retained counsel competent and experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously. The interest of members of the Class will be fairly and adequately protected by Plaintiff and his counsel.

55. **Superiority** – Fed. R. Civ. P. 23(b)(3): The class action is superior to other available means for the fair and efficient adjudication of the claims alleged in this Complaint. The damages suffered by each individual Class member may be limited. Damages of such magnitude are small given the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct. Further, it would be virtually impossible for the members of the Class individually, to redress effectively the wrongs done to them. Even if the members of the Class themselves could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and the court system presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits

of single adjudication, economy of scale, and comprehensive supervision by a single court.

## LOSS CAUSATION/ECONOMIC LOSS

56. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of IMAX securities and operated as a fraud or deceit on purchasers of IMAX securities by misrepresenting the Company's operating condition, financial results and future business prospects. Defendants achieved this by making positive statements about IMAX's business while they knew that the Company was suffering from a variety of adverse factors which were then negatively impacting its financial results, as detailed herein. Later, however, when Defendants' prior misrepresentations were disclosed and became apparent to the market, the price of IMAX securities fell precipitously as the prior artificial inflation came out of IMAX's share price. As a result of their purchases of IMAX publicly traded securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages under the federal securities laws.

57. The decline in IMAX's share price at the end of the Class Period was a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of IMAX's share price declines negate any inference that the loss suffered by Plaintiff and other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

## FIRST COUNT

### Violation of Section 10(b) Of The Exchange Act And Rule 10b-5 Promulgated Thereunder Against All Defendants

58. Plaintiff repeats and realleges each allegation set forth above and further alleges as follows.

59. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase IMAX securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

60. Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make their statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for IMAX securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Individual Defendants are liable as primary participants in the wrongful and illegal conduct charged herein and as controlling persons as alleged below. The Company is sued as a primary violator of the securities laws.

61. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information

about the business, operations, products and future prospects of IMAX as specified herein.

62. These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of IMAX's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about IMAX, its business operations and its financial results in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of IMAX securities during the Class Period.

63. Each of the Individual Defendants' primary liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team; (ii) each of these Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company was privy to the undisclosed, material facts set forth above about the Company's operations; (iii) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's operations and products at all relevant times; and (iv) each of these Defendants was aware of the Company's dissemination of information to the investing public which he knew or recklessly disregarded was materially false and misleading.

64. The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing IMAX's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' material misrepresentations and omissions of the Company's business, operations and products throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

65. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of IMAX securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of IMAX publicly-traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired IMAX securities during the Class Period at artificially high prices and were damaged thereby.

66. At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had

Plaintiff and the other members of the Class and the marketplace known the truth, they would not have purchased or otherwise acquired their IMAX securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

67. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

68. As a direct and proximate result of Defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND COUNT

### Violation of Section 20(a) Of The Exchange Act Against The Individual Defendants

69. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

70. The Individual Defendants acted as controlling persons of IMAX within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, stock ownership and/or participation in the Company's operations, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiffs contend were false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were

issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

71. In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

72. As set forth above, IMAX and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on his own behalf and on behalf of the Class, prays for relief and judgment as follows:

A. For an order determining that this action is properly maintained as a class action, appointing Plaintiff as lead plaintiff and his counsel as lead counsel for the Class, and certifying the him as a Class representative under Rule 23 of the Federal Rules of Civil Procedure;

B. For an order awarding Plaintiff and Class members compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongful conduct in an amount to be proven at trial;

C. For an order enjoining Defendants from continuing to engage in unlawful business practices, as alleged herein;

D. For an order awarding Plaintiff and Class members pre-judgment and post-judgment interest;

E. For an order awarding Plaintiff and Class members their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

F. For an order awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury.

Dated: August 26, 2006

Respectfully submitted,

**GIRARD GIBBS LLP**

Jonathan K. Levine (JL-8390)

Aaron M. Sheanin (not admitted in SDNY)
601 California Street, 14th Floor
San Francisco, California 94108
Telephone: (415) 981-4800
Facsimile: (415) 981-4846

Attorneys for Plaintiff Floyd Reynolds

Janine L. Pollack (JP-0178)
**MILBERG WEISS BERSHAD & SCHULMAN LLP**
One Pennsylvania Plaza, 49th Floor
New York, New York 10119
Telephone: (212) 594-5300
Facsimile: (212) 868-1229

Local Counsel

**CERTIFICATION OF PROPOSED LEAD PLAINTIFF**
**PURSUANT TO THE FEDERAL SECURITIES LAWS**

I, Floyd Reynolds, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1. I have reviewed the complaint against IMAX Corporation and its officers, prepared by Girard Gibbs LLP, whom I designate as my counsel in this action for all purposes.

2. I did not acquire the securities of IMAX Corporation at the direction of Girard Gibbs LLP or in order to participate in any private action under the federal securities laws.

3. I am willing to serve as a lead plaintiff either individually or as part of a group. I understand that a lead plaintiff is a representative party who acts on behalf of other class members in directing the litigation, and whose duties may include testifying at deposition or trial.

4. I will not accept any payment for serving as a representative party beyond my pro rata share of any recovery, except reasonable costs and expenses, such as lost wages and travel expenses, directly related to the class representation, as ordered or approved by the Court pursuant to law.

5. I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years.

6. I understand that this is not a claim form, and that my ability to share in any recovery as a class member is not affected by my decision to serve as a representative party.

7. My purchases and sales of IMAX Corporation securities between February 17, 2006 and August 9, 2006 are listed in Attachment A.

8. I declare under penalty of perjury that the foregoing is true and correct.

Executed this 28 th day of August, 2006

Floyd Reynolds

**ATTACHMENT A**

**PURCHASES AND SALES OF IMAX CORPORATION SECURITIES BY FLOYD REYNOLDS**

| Trade Date | Number of Shares | Price Per Share/Unit | Buy or Sell |
|---|---|---|---|
| 7/28/2006 | 10 Calls x/March 2007 at SP $12.50 | $.85 | Bought |
| 7/28/2006 | 5 Puts x/March 2007 at SP $10.00 | $1.05 | Sold |